## SPALDING v. UNITED STATES.
### No. 8575.

Circuit Court of Appeals, Ninth Circuit.
June 30, 1938.

698

William W. Lovett, Jr., and Joseph D. Peeler, both of Los Angeles, Cal., for appellant.

James W. Morris, Asst. Atty. Gen., Sewall Key, Norman D. Keller, and Lester L. Gibson, Sp. Assts. to Atty. Gen., and Peirson M. Hall, U. S. Atty., E. H. Mitchell, Asst. U. S. Atty., Alva C. Baird, Sp. Asst. to U. S. Atty., and Eugene Harpole, Sp. Atty., U. S. Treasury Department, all of Los Angeles, Cal.

Before WILBUR, MATHEWS, and HEALY, Circuit Judges.

MATHEWS, Circuit Judge.

Alleging that she had overpaid her income taxes for 1929 and 1930 to the extent of $27,125.39 and $74,419.37, respectively, appellant, Caroline C. Spalding, filed claims for refund, pursuant to § 3226 of the Revised Statutes, as amended by § 1103(a) of the Revenue Act of 1932, 26 U.S.C.A. §§ 1672–1673. The 1929 claim was denied. The 1930 claim was granted in part and denied in part.

Thereafter, pursuant to § 3226, supra, and § 24(20) of the Judicial Code, 28 U.S.C.A. § 41(20), appellant brought suits against appellee, the United States,[1] to recover the claimed overpayment for 1929 and the unrefunded portion ($61,842.94) of the claimed overpayment for 1930. The cases were consolidated for trial and were tried by the court without a jury, trial by jury having been expressly waived. The court filed a written opinion (D.C., 17 F. Supp. 957) and special findings of fact and thereupon entered judgments in appellant's favor for $6,436.43 and $13,371.-06, respectively.[2] Deeming these amounts inadequate, appellant appealed from both judgments. Involving identical questions, the appeals were consolidated and heard together.

The trial court's findings of fact are not challenged. The facts found are as follows:

On March 21, 1929, pursuant to § 4 of c. 303, Statutes of California, 1921, p. 405, as amended (Stats.1929, p. 12; Deering's General Laws, 1931, Act 6341, p. 3456), the State of California granted appellant a permit to prospect for oil and gas on certain State tidelands. Proceeding thereunder, appellant started construction of a pier and foundations for drilling a "discovery well." Thereafter appellant and Pacific Western Oil Company entered into an agreement whereby the Oil Company agreed to—and it did—drill the well for appellant, on a basis of cost, plus 10%. The well was completed on November 16, 1929. In and about the drilling of it, the Oil Company spent $256,874.39.

On November 22, 1929, pursuant to § 5 of c. 303, supra, the State granted appellant a lease (No. 93) for the production of oil and gas from the tidelands covered by her permit. By this lease, appellant was required, inter alia, to drill "to production," or to a depth of not less than 4,000 feet, at least eight wells on the leased property, four of which were to be drilled within the first four years and all

---

[1] The Collector by whom the taxes were collected being no longer in office.

[2] As to these amounts, there is here no controversy.

within the first twelve years of the term, and to pay to the State a royalty of 5% of the value of oil and gas produced from the leased property, or at the State's option, 5% of such oil and gas. In the acquisition of her permit and lease and in construction work done on the property, appellant spent $176,043.84. This was exclusive of, and in addition to, the $256,874.39 which the Oil Company spent, and which appellant was obligated to repay.

On December 19, 1929, effective as of November 25, 1929, appellant and the Oil Company entered into a "drilling agreement," whereby the Oil Company was granted the right to go upon the leased property, drill wells thereon and produce oil and gas therefrom. The agreement provided that the Oil Company should, at its own expense, drill all wells which by the lease appellant was required to drill, pay all royalties which by the lease appellant was required to pay, and do all other things which by the lease appellant was required to do; that, if the State elected to take its royalty in money, the Oil Company should deliver to appellant, for sale, the total production of oil and gas from the leased property, and appellant should pay the Oil Company 66⅔% of the net proceeds thereof, and the Oil Company should pay the State its 5% royalty; that, if the State elected to take its royalty in kind, the Oil Company should deliver to appellant, for sale, 95% of the total production of oil and gas, and appellant should pay the Oil Company an amount equal to 61⅔% of the net proceeds of the total production;[3] and that all taxes on the lease, or on the leased property or property placed thereon, or on oil or gas produced therefrom, should be paid by the Oil Company, but that one-third of such taxes should be repaid to the Oil Company by appellant.

The agreement was to continue in effect during the term of the lease, or any extension or renewal thereof, unless sooner terminated by operation of law or in one of the several modes therein specified. It could not be terminated by appellant, except for non-performance by the Oil Company, until 15 years after its date.

As part of the consideration for the execution of the agreement, the Oil Company paid appellant $174,179.94 and released her from her obligation to repay to it the $256,874.39 mentioned above. Thus appellant got back all but $1,863.90 of her investment, and the Oil Company made an investment of $431,054.33.

The agreement was performed in accordance with its terms.

In 1929 and 1930, oil and gas were produced by the Oil Company from the leased property and were delivered to and sold by appellant, in accordance with the agreement. The State took its royalties in money, not in kind. Hence, appellant received and sold the total production of oil and gas from the leased property, paid the Oil Company 66⅔% of the net proceeds and retained 33⅓% thereof. In determining appellant's tax liability for 1929 and 1930, amounts so received and retained by her were treated as taxable income. On such income, the taxes here involved were assessed and collected.

■ Two questions are presented. The first is whether appellant's income, derived as aforesaid, was subject to Federal taxation. She contends that her lease and she herself, as lessee thereunder, were instrumentalities of the State, which the United States could not tax, and that, therefore, all income received by her as such lessee was immune from Federal taxation. The contention must be rejected. On this question, Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. ——,[4] is directly in point and is controlling.

The other question is, What allowance was appellant entitled to for depletion of oil and gas wells on the leased property? Paragraph (3) of § 114(b) of the Revenue Act of 1928, 45 Stat. 821, 26 U.S.C.A. § 114 note, provides: "In the case of oil and gas wells the allowance for depletion shall be 27½ per centum of the gross income from the property during the taxable year. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that

---

[3] Thus, whether the State took its royalty in money or in kind, the net result was the same, the actual distribution being, in either case, 5% to the

State, 33⅓% to appellant and 61⅔% to the Oil Company.

[4] Affirming in part, reversing in part, Bankline Oil Co. v. Commissioner, 9 Cir., 90 F.2d 899.

in no case shall the depletion allowance be less than it would be if computed without reference to this paragraph."[5]

It is conceded that, in each of the taxable years involved, appellant was entitled to a depletion allowance under paragraph (3) of § 114(b), but the parties disagree as to what amount should have been allowed. Appellant contends that she was entitled to an allowance of 27½% of the net proceeds of the total production of oil and gas from the leased property. Appellee contends that appellant was entitled only to one-third of that amount.

The trial court sustained appellee's contention and, we think, properly so. By her lease from the State, appellant acquired an economic interest in the oil and gas in place, which would be depleted by production—in other words, a depletable interest. The State, as lessor, retained a similar interest. By its agreement with appellant, the Oil Company, whether technically it became a sublessee or not, acquired an economic interest in the oil and gas in place identical with that of a lessee, and appellant retained an interest identical with that of· a lessor. Palmer v. Bender, 287 U.S. 551, 558, 53 S.Ct. 225, 227, 77 L.Ed. 489. See, also, Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312, 320, 55 S.Ct. 174, 178, 79 L.Ed. 383; Thomas v. Perkins, 301 U.S. 655, 659, 57 S.Ct. 911, 912, 81 L.Ed. 1324. Thereafter, the State, appellant and the Oil Company each had a depletable interest, the State a 5% interest, appellant a 33⅓% interest and the Oil Company a 61⅔% interest.

This conclusion does not run counter to, but is in complete harmony with, Helvering v. Bankline Oil Co., supra; Helvering v. O'Donnell, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. —,[6] and Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. —.[7] In those cases, depletable interests in oil or gas in place were claimed, unsuccessfully, by persons who had not produced and could not have produced such oil or gas, and who had no capital investment therein. In this case, the Oil Company was the producer and, as heretofore shown, had invested in the oil and gas in place $431,054.33. Hence, the applicable doctrine is that of Palmer v. Bender, supra, not that of the Bankline, Elbe and O'Donnell Cases.

Though referred to in the agreement as a "contractor," the Oil Company was not, as contended by appellant, a mere contractor for hire. It had the right to, and did, occupy the leased property and produce oil and gas therefrom. It had the right to, and did, receive and retain as its own 61⅔% of the net proceeds of the oil and gas so produced. These were continuing rights which, except for non-performance of the agreement by the Oil Company, were not terminable by appellant until 1944. The possessor of such rights cannot be regarded as a mere hireling.

Appellant's counsel, in oral argument, adverted to the fact that the Oil Company, at the time of making the agreement with appellant, held an oil and gas lease (No. 92) theretofore granted to it by the State,[8] under c. 303, supra. It was thereupon argued that the agreement between appellant and the Oil Company should not be construed as an assignment of appellant's lease, because, it was said, the agreement would, if so construed, violate § 12 of c. 303, which provides: "No person, association or corporation, shall take or hold, under the terms of this act, more than one oil or gas permit or lease * * *."

A sufficient answer to this argument is that we have not held, and do not hold, that the agreement between appellant and the Oil Company constituted an assignment of appellant's lease. What we do hold is that the Oil Company, by that agreement, acquired a depletable interest in the oil and gas in place in the leased property, and that, thereafter, appellant's depletable interest was a one-third interest only.

Judgments affirmed.

---

[5] Section 23(*l*) of the same Act, 26 U. S.C.A. § 23 note, provides that, in computing net income, there shall be allowed as deductions: "In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * * according to the peculiar conditions in each case. * * * In the case of leases the deduction shall be equitably apportioned between the lessor and lessee. * * *"

[6] Reversing Commissioner v. O'Donnell, 9 Cir., 90 F.2d 907.

[7] Reversing Elbe Oil Land Development Co. v. Commissioner, 9 Cir., 91 F.2d 127.

[8] See United States v. Spalding, 9 Cir., 97 F.2d 701, decided this day.