SOUTHWEST EXPLORATION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24872. Promulgated September 10, 1952.

962

*Melvin D. Wilson, Esq.*, for the petitioner.
*B. H. Neblett, Esq.*, for the respondent.

964

966

## OPINION.

VAN FOSSAN, *Judge:* This case presents two questions. The first is whether petitioner may properly deduct the so called intangible drilling costs of certain oil wells drilled by it during the years 1939 to 1942, inclusive.

Petitioner claims the right to the deduction here in dispute by virtue of the option granted in Regulations 111, section 29.23 (m)--16.[1]

Respondent contends that the regulations cited and relied upon by petitioner are inapplicable to the present factual situation. He argues that the drilling of the wells in question constituted part of the consideration for the Agreement for State Easement No. 392.

The regulations in question apply to the so called intangible costs incurred in connection with drilling wells on property, the title to which is held in fee or under a lease by the taxpayer-driller. They do not apply to such costs when the drilling is done on the land of another or as consideration for acquisition of an interest in the lands of others. *Hardesty* v. *Commissioner*, 127 F. 2d 843, affirming 43 B. T. A. 245. Thus, if the wells in question were drilled as part of the consideration for the Easement Agreement, then the so called intangible costs incident thereto are not deductible pursuant to the option contained in the aforementioned regulations. Rather, they represent capital expenditures recoverable only through depletion allowances. *F. H. E. Oil Co.*, 3 T. C. 13, affd. 147 F. 2d 1002; *F. F. Hardesty*, 43 B. T. A. 245, affd. 127 F. 2d 843; *United States* v. *Sentinel Oil Co.*, 109 F. 2d 854; *State Consolidated Oil Co.* v. *Commissioner*, 66 F. 2d 648, certiorari denied 290 U. S. 704. On the other hand, if such drilling was not a part of the consideration for the Easement Lease, then the expenses incurred in connection therewith are properly deductible as maintained by petitioner. The ultimate question is whether the drilling of the wells in question was part of the consideration by which petitioner acquired its interest in the leased premises. The answer to this question is dispositive of this issue.

[1] REGULATIONS 111. INCOME TAX.

Sec. 29.23 (m)–16. **Charges to capital and to expense in case of oil and gas wells.**—(a) *Taxable years beginning prior to January 1, 1943.*—The provisions of this subsection apply only to taxable years beginning prior to January 1, 1943.

(1) Items chargeable to capital or to expense at taxpayer's option :

(i) Option with respect to intangible drilling and development costs in general : All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used (A) in the drilling, shooting, and cleaning of wells ; (B) in such clearing of ground, draining, road making, surveying, and geological work as are necessary in preparation for the drilling of wells ; and (C) in the construction of such derricks, tanks, pipe lines, and other physical structures as are necessary for the drilling of wells and the preparation of wells for the production of oil or gas. In general, this option applies only to expenditures for those drilling and *development* items which in themselves do not have a salvage value. For the purpose of this option labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value. Drilling and development costs shall not be excepted from the option merely because they are incurred under a contract providing for the drilling of a well to an agreed depth, or depths, at an agreed price per foot or other unit of measurement. [Emphasis added.]

Petitioner agrees with the foregoing statement of law. However, it contends that it was obligated to drill only the first eleven offset wells as consideration for the lease; that any wells drilled thereafter were so called optional wells drilled on its own lease; that the drilling of the optional wells was not a condition precedent but was in the nature of a condition subsequent; that it had and exercised the option to charge the drilling costs to expenses; and that, therefore, it should be permitted the deductions in dispute.

We are entirely unimpressed by petitioner's argument. Rather, we feel that the provisions of the Easement Agreement support respondent's position and point up the fact that complete execution of the drilling program attached to and made a part of the Agreement for Easement No. 392 was the primary consideration for the Agreement.

The prescribed drilling program clearly contemplated the full development of the entire 835 acres involved. It required petitioner to maintain continuous drilling operations until a total of 83 wells had been drilled. This requirement was subject only to petitioner's right to quitclaim the Agreement as to all the "State lands" embraced therein "* * * or as to any part or parts thereof * * *." In the event of a partial quitclaim pursuant to this arrangement, petitioner's obligations with respect to the number of wells to be drilled other than offset wells, was proportionately reduced. Thus, petitioner's obligation could be alleviated only to the extent to which it was assumed by petitioner's grantee in any such quitclaim transaction.

In the event of petitioner's failure to continue and to complete the prescribed drilling program or to quitclaim the agreement to a party who could assume petitioner's obligations, provision was made in the Agreement whereby the State could reenter the premises upon 30 days' notice, cancel the Agreement, or exercise any legal or equitable remedy to which it might otherwise be entitled. Further, the Agreement also terminated should petitioner be adjudged a bankrupt or should an attachment be levied. Consequently, it appears that petitioner's right, title, or interest in and to the oil and gas in place vested only as and when the prescribed drilling program was completed. While petitioner itself was in no sense bound to continue the drilling and development program set forth as a part of the Agreement, only by doing so could it acquire and retain any right, title, or interest under the Agreement. Clearly the acquisition of such rights was contingent upon petitioner's continued drilling and its completion of the prescribed number of producing wells.

As said above, the primary purpose of the Agreement for State Easement No. 392 was to procure the drilling of oil wells on, and the development of, the entire 835 acres covered by the lease. This was

the essence of the transaction and constituted the consideration therefor. Accordingly, it matters not whether we regard petitioner's interest as vesting upon execution of the Agreement subject to being divested for nonperformance of conditions subsequent or upon completion of the number of producing wells prescribed in the drilling program. *F. H. E. Oil Co., supra.* Under either view, the drilling of the wells was the consideration for petitioner's interest in the gas and oil in place. In *United States* v. *Sentinel Oil Co., supra,* the Court said, *inter alia:*

> Appellee attempts to distinguish the State Consolidated Oil case from the instant one, by the fact that in the former case title to the property was not to pass until after the property owner had received his $1,400 from the proceeds of the well, while in the instant case title passed upon the execution of the contract. We do not think that this distinction changes the situation. In both cases the drilling expenditures were the consideration for the passing of title to the land.

The foregoing is apposite here.

We hold, therefore, that petitioner is not entitled to the deductions claimed. Respondent's action in disallowing such deductions is sustained.

The second question involves petitioner's right to a depletion deduction on the 24½ per cent of its net profits which it paid to certain upland owners. It was on and through the property of these owners that petitioner had located various "whipstock" wells for the production of gas and oil from the submerged lands located adjacent thereto.

As pointed out above, petitioner acquired the sole right to exploit the oil property in question by virtue of its 1938 agreement with the State of California. The terms of this agreement provided that any development of, or drilling into, the submerged lands covered thereby must be conducted from littoral or upland sites. This provision required as a condition precedent to the agreement that the requisite easements be procured from the owners of the adjacent uplands and that certification as to such action then be made in the form of an endorsement by the upland owners attached to the agreement as finally executed. In consideration of the necessary easement and certification petitioner agreed to pay to the upland owners involved an amount equal to 24½ per cent of its net profits.

Petitioner seeks to include the foregoing amount within its gross income subject to a deduction for depletion in accordance with sections 23 (m)[2] and 114 (b) (3),[3] Internal Revenue Code.

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, accord-

In order to determine whether petitioner is entitled to include the above amount within its gross income and then be allowed the depletion claimed, we would briefly recall the purpose and intent of the statutory allowance. Because of their inherent nature, oil and gas reserves, together with other mineral deposits, have been recognized and designated as wasting assets. *Anderson* v. *Helvering*, 310 U. S. 404. By this designation it is meant that a portion of the capital asset is consumed in the production of income through exploitation thereof. *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362. Hence, Congress has granted the deduction in question as an equitable means of allowing a tax free return of the capital so consumed in the process of production. *Anderson* v. *Helvering, supra.* It follows that the depletion deduction is allowable only to those who have a capital investment or economic interest in the oil or other mineral in place from which income is received by reason thereof. *Kirby Petroleum Co.* v. *Commissioner*, 326 U. S. 599; *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U. S. 25; *Helvering* v. *Bankline Oil Co., supra; United States* v. *Spalding*, 97 F. 2d 701. In determining whether a taxpayer has such an investment or interest no significance attaches to the particular legal form of the transaction creating the rights. *Burton-Sutton Oil Co.* v. *Commissioner, supra; Palmer* v. *Bender*, 287 U. S. 551; *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364. It is enough that the taxpayer has acquired through any form of legal relationship the right to share in the oil produced. *Palmer* v. *Bender, supra.* And a right to share in the profits from the sale of the oil following extraction is analogous to a right to share in the mineral itself. *Helvering* v. *Twin Bell Oil Syndicate*, 293 U. S. 312; *Anderson* v. *Helvering, supra; Kirby Petroleum Co.* v. *Commissioner, supra; Burton-Sutton Oil Co.* v. *Commissioner, supra.* However, the term "economic interest" does not embrace a "* * * mere economic advantage derived from production through a contractual relation to the owner by one who has no capital investment in the mineral deposit * * *." *Helvering* v. *Bankline Oil Co., supra.* On the contrary, it appears clearly that an allowance for depletion is warranted only where, by

ing to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

³ SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *

agreement between the parties, the taxpayer has obtained a capital interest in the oil and gas in place, to the severance and sale of which one must look for the return of capital consumed in that process. The right to share in the net receipts disassociated from an economic interest therein does not entitle the holder thereof to an allowance for depletion. *Kirby Petroleum Co.* v. *Commissioner, supra; Burton-Sutton Oil Co.* v. *Commissioner, supra; Anderson* v. *Helvering, supra; Helvering* v. *O'Donnell,* 303 U. S. 370.

In the instant case, it cannot be gainsaid that petitioner possessed an economic interest in the oil involved. The dispute arises as to whether petitioner was the sole owner of such an interest during the taxable years. Petitioner contends that it acquired and has retained the entire economic interest conveyed under the Agreement for State Easement No. 392. Respondent, on the other hand, rejects petitioner's contention and argues on brief that the upland owners, by their endorsement of the Agreement for State Easement No. 392, became parties thereto; that such owners thereby acquired an economic interest in the oil and gas in place directly from the State; that the income received therefrom by the upland owners is includible in their gross income, rather than that of petitioner, subject to the depletion deduction here in dispute.

We have no desire or purpose to enter into the dispute as to the claims to rights in the submerged coastal areas (see *United States* v. *California,* 332 U. S. 19 [1947]) and what we say herein is not intended in any way to pass upon the competing interests asserted in that litigation or growing out of the cited decision.[4]

Prior to 1938 the State allowed such oil property as is here involved to be developed and operated from piers, islands or barges. In that year the State Legislature passed the so called State Lands Act of 1938 pursuant to the provisions of which such methods of drilling and development were proscribed. This Act called for each well thereafter drilled in the submerged lands to be drilled from filled lands or slant-drilled from an upland or littoral drill site. All equipment, derricks, machinery, appliances, surface structures and operations were required to be located upon such site. Section 87 (a), Chap. 5, Calif. Stats., Ex. Sess., 1938. This statute was passed as a regulatory measure applying to the development and exploitation of the coastal oil deposits. Obviously, the Act was not meant to convey any economic interests therein to anyone. Nor do we believe that it so did. Con-

---

[4] Since the decision in *United States* v. *California, supra,* extraction of oil from the California submerged coastal lands, pursuant to leases previously granted by the State, has been authorized by stipulations executed by the State and the United States. See Hearings before Senate Committee on Interior and Insular Affairs on S. 155, 81st Cong., 1st Sess., pp. 279–282; Hearings on S. J. Res. 195, 81st Cong., 2d Sess., pp. 22–26; S. J. Res. 20, 82d Cong., 1st Sess., pp. 13–17.

sequently, insofar as the 835 acres here involved are concerned, any present economic interests therein were acquired by virtue of, and simultaneously with, the Agreement for State Easement No. 392 or through some transaction subsequent thereto.

The State and petitioner were the only parties to the body of this agreement. The granting clause therein granted to petitioner the sole and "* * * exclusive right to drain, take, receive, extract, remove, and produce from the * * * lands oil, gas, and other hydrocarbon substances * * *." This right is not made subject to any preexisting rights and there is no provision therein for income derived from oil production to be shared with third parties. Within its four corners, then, it would appear that such economic interests as were passed therein, were acquired by petitioner alone. Nor do we feel that further interests were obtained by other parties outside thereof because of the endorsement attached thereto but not included therein by any reference. There also appears to have been no such acquisition by third parties through any action on the part of the petitioner. There are in evidence three instruments whereby petitioner acquired the requisite upland easements. In return for such easements the owners thereof were granted the right to 24½ per cent of the net profits derived from petitioner's operations. But we do not feel that such parties thereby acquired a capital interest in the oil in place. One such agreement specifically provides that it shall not be so construed as to be a transfer of "* * * any right, title or interest in [the] * * * State lands or in or under [the] * * * State Easement, * * *"; and that it was the express intention of the parties thereto not to create a partnership relationship. Further, these parties were never owners nor lessees of the leased property. They did not, and could not, during the taxable years, have produced oil therefrom. Nor did they at any time during the period have any capital investment in the oil or gas in place. Cf. *United States* v. *Spalding*, *supra*. It would seem that the above-mentioned agreements could be terminated or modified at any time petitioner's agreement with the State of California was so terminated or modified. Under these circumstances it would appear that the upland drill sites and the agreements granting them to petitioner could be abandoned and terminated by petitioner at any time the State of California might see fit to change its policy toward drilling in the submerged coastal lands.

In summation, then, it is our view that petitioner was the sole recipient under the Agreement for State Easement No. 392 of an economic interest in the oil property involved; that at no time thereafter was any economic interest therein acquired by third parties; that the

amounts equal to 24½ per cent of petitioner's net profits were not paid as royalties or rents based upon an economic interest therein; and that, therefore, these amounts are includible in petitioner's gross income subject to the statutory allowance for depletion. Accordingly, we so hold. Respondent's claim for increased deficiencies, affirmatively set out in his amended answer, will be considered in the recomputation under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*